**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. STEPHANIE DAVIS, an individual ) | |
| ) | |
| Plaintiff, ) | |
| v.                                   ) | Case No.  18-cv-00338-CVE-JFJ |
| ) | |
| 1. WESTWIND ENTERPRISES, LTD.,   ) | JURY TRIAL DEMANDED |
| d/b/a DEERFIELD SPRINGS, a foreign ) | |
| limited partnership,                  ) | ATTORNEY'S LIEN CLAIMED |
| 2. WESTWIND MANAGEMENT, INC., ) | FOR THE FIRM |
| d/b/a DEERFIELD SPRINGS,          ) | |
| a foreign corporation,                ) | |
| ) | |
| Defendant.                 ) | |

## COMPLAINT

**COMES NOW,** the Plaintiff, Stephanie Davis ("Plaintiff"), through her attorney of record, Charles C. Vaught of *Armstrong & Vaught, P.L.C.* and hereby brings retaliation claims pursuant to the Americans with Disabilities Act of 1990, as amended, *42 U.S.C § 2000e(b)* (the "ADA"), a breach of contract, and a bad faith claim against Westwind Enterprises, Ltd. ("Defendant") for violations of the statute committed by Defendant.

## JURISDICTION AND VENUE

1. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1367(a). In particular, jurisdiction is premised on violations of the ADAAA.

2. Declaratory and equitable relief are sought pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202, and compensatory and punitive damages are sought pursuant to 42 U.S.C. § 2000e, *et seq.*

3. Costs and attorneys' fees may be awarded pursuant to Rule 54 of the Federal Rules of Civil Procedure and the above statutes.

4. This Court has jurisdiction over the parties and the subject matter of this action, and this action properly lies in the Northern District of Oklahoma, pursuant to 28 U.S.C. § 1331 and 28 U.S.C.

§ 1391(b), because the unlawful retaliatory conduct and breached contract alleged herein arose in this judicial district.

5. Plaintiff is, and was at all times relevant hereto, a resident of the State of Oklahoma, residing in Claremore, Rogers County, Oklahoma.

6. Defendants are, and were at all times relevant hereto, foreign corporations which maintained operations in Tulsa, Tulsa County, Oklahoma. On information and belief, Defendant Management is the successor-in-interest to Defendant Enterprises.

7. The acts and/or omissions giving rise to this lawsuit occurred in Tulsa County, State of Oklahoma.

8. In conformance with the ADAAA statutory prerequisites, Plaintiff submitted pre-charge information to the United States Equal Employment Opportunity Commission ("EEOC") less than 300 days after the events described herein occurred. Subsequently, Plaintiff submitted a Charge of Discrimination, prepared by the EEOC, to the EEOC. The EEOC completed its investigation and issued a Notice of Right to Sue on March 29, 2018 (attached as Exhibit A hereto and hereby incorporated by reference as though fully set forth herein), which was received by Plaintiff via regular mail on April 2, 2018. Plaintiff has timely filed her *Complaint* within 90 days of her receipt of the Notice of Right to Sue from the EEOC.

9. Defendant is an employer as defined by the ADAAA, in that it was a public entity engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

10. Plaintiff was, at all times relevant hereto, an employee as defined by the ADAAA, in that the definition of employer includes former employees who are subjected to retaliatory action.

## OPERATIVE FACTS

11. In June of 2013, Plaintiff began employment with Defendant Westwind Enterprises, Inc. d/b/a Deerfield Estates at its mobile home community, Deerfield Springs, Located in Claremore, Oklahoma. Plaintiff was hired as an Assistant Manager. Plaintiff's immediate supervisor was Kelle Alsip, who is also her mother.

12. Around November, 2016, Plaintiff became manager of Carriage Village Mobile Home Park.

13. On March 15, 2017, Plaintiff checked herself in to Laureate to receive emergent in-patient treatment and remained in that facility until she was released on March 22, 2017. At the time of her release from Laureate, Plaintiff obtained a release to return to work for March 28, 2017.

14. The facts and circumstances surrounding Plaintiff's absence from employment and expected return to work were communicated to Defendant during Plaintiff's absence and such absence from work was approved by her employer. In fact, Plaintiff submitted a request for leave under the federal Family and Medical Leave Act ("FMLA"), which was approved by Defendant, while she was absent from work.

15. On March 24, 2017, Plaintiff received a telephone call from a member of Defendant's management team, Mary Smith, and was informed that her employment was terminated. Plaintiff immediately protested her termination to Ms. Smith and advised her that it was illegal to terminate her while she was absent from work on an approved FMLA leave. Subsequently, on March 27, 2017, Plaintiff received a telephone call from another member of Defendant's management team, Dianne Hauck, and was again informed that her employment was terminated.

16. During Plaintiff's employment, Plaintiff was regularly required to work in excess of 40 hours per week but was not paid for any hours worked in excess of 40 hours in any work week.

Instead, Defendant implemented a "comp time" policy for its hourly employees and promised that hourly employees, such as Plaintiff, would be permitted to use "comp time" throughout their employment to miss work but still receive pay. At the time of her termination, Defendant refused to reimburse Plaintiff for any accrued but unused "comp time" to which she was owed.

17. As a benefit of employment, Plaintiff was covered under a group health plan provided to its employees by Defendant. Defendant failed to provide Plaintiff with notice of her right to continuation coverage as it was mandated to do under the federal Consolidated Omnibus Budget Reconciliation Act ("COBRA").

18. As a result of these facts, Plaintiff, through her counsel, informed Defendant that she intended to assert the following claims against her former employer: (1) FMLA interference; (2) FMLA retaliation; (3) violations of the American's with Disabilities Act, as amended ("ADAAA)"; (4) violations of the Fair Labor Standards Act ("FLSA"); and (5) violations of COBRA as enforced through the Employee Retirement Income Security Act of 1974 ("ERISA").

19. After Defendant was put on notice of these claims, the parties agreed to private mediation and selected Randall Snapp of Crowe & Dunlevy as the mediator. The mediation was held on October 17, 2017 at 1:00pm.

20. On October 17, 2017, the parties successfully mediated all claims and a contract was prepared and signed by the parties which set forth the terms of the agreement. That settlement was memorialized in the hand-written Settlement Agreement attached hereto as **Exhibit A.**

21. The settlement contract included a non-disparagement clause which purportedly called for forfeiture of 50% of the gross proceeds of the settlement in the event that Plaintiff made "disparaging" comments subsequent to her execution of the settlement contract.

22. On October 17, 2017, Plaintiff observed Leo LNU, Maintenance Supervisor at Deerfiend Springs taking pictures of Plaintiff's residence around 12:00 a.m.

23. On October 19, 2017, Plaintiff's mother Kelle Alsip, was terminated by Defendant via a note which was left on her truck. That same day, Defendant's District Managers, Mary Smith and Rubi Pagan, walked around Plaintiff's mobile home and took pictures of the exterior of Plaintiff's residence.

24. On October 26, 2017, counsel for Defendant, Steve Broussard contacted Plaintiff's attorney and advised him that Plaintiff allegedly made veiled reference to his client's belief that Plaintiff had violated a non-disparagement clause which had taken effect upon her signing of the initial settlement contract. Counsel for Defendant alleged that Plaintiff stated Westwind Enterprises was a "bad group" or a "terrible group" over the past weeks. Mr. Broussard further advised Plaintiff's attorney that there would be a rigorous prosecution of any breaches of the contract between the parties.

25. On October 28, 2017, Defendant obtained a written statement from a Deerfield Springs resident, Peggy Hunt, which stated that Plaintiff "bad talk" Westwind Enterprises and Ray Farris. In that statement, Ms. Hunt also alleged that Plaintiff had threatened to "knife whoever rated (sic) on her mom." However, the dates of these statements were not identified by Ms. Hunt. Additionally, Ms. Hunt's daughter who wrote this statement, Bobbi Jo Pardee, subsequently met with Plaintiff's attorney and retracted this statement. Ms. Pardee informed Plaintiff's attorney that Karen Coffelt implied to her that she would receive a job with Defendant if she would write letters against Plaintiff, and told Ms. Pardee what to write in the letter. Ms. Pardee admitted that neither she, nor Ms. Hunt, had ever heard Plaintiff threaten to "knife" anyone.

5

26. On October 31, 2017, Defendant's attorney, Steve Broussard, contacted Plaintiff's attorney and informed him that Ray Farris, owner of Westwind Enterprises and others were "very afraid" of Plaintiff because she had asserted that she would "knife a bitch" when she learned who had caused her mother's termination. Defendant also alleged Plaintiff called Ray Farris both an "asshole" and a "jerk." As both of these statements were allegedly made subsequent to the mediation, Mr. Broussard advised that Defendant was deducting 50% of the gross settlement as punishment for Plaintiff's alleged disparagement of Westwind Enterprises and Ray Farris.

27. On November of 2016, Rubi Pagan met with Angela Smithson and falsely stated that Plaintiff had threatened to cut Karen Coffelt. When Ms. Smithson inquired as to whether a police report had been filed regarding this threat, Ms. Coffelt stated that she had not filed a police report.

28. On November 4, 2017, Plaintiff determined that Defendant had increased her water bill by $20.00. Prior to the mediation, and for as long as Plaintiff had lived at Deerfield Springs, her water bill had been based upon a national average of water consumed for the number of people residing in the mobile home. After the mediation, Defendant changed her water bill so that it was based on 3 units, which raised Plaintiff's bill by $20.00 per month. When Plaintiff spoke to Karen Coffelt, Property Manager, about the increase, she was advised that her water bill was calculated by the billing program that Defendant used, Rent Manager, and was correct. When Plaintiff informed Karen Coffelt that a reading had to be entered into Rent Manager to determine the amount to bill for water usage, Ms. Coffelt advised Plaintiff that she would have to contact corporate to address this issue. Plaintiff did advise Ms. Coffelt that it was her job to contact corporate, as she was the Property Manager, and Plaintiff asked her to do so. On November 8, 2017, when Plaintiff spoke to Ms. Coffelt, with Cassandra Ortiz present, about

6

the water bill again, Plaintiff was informed by Ms. Coffelt that her water bill had not been handled correctly in the past and that the increase would remain in effect.

29. On November 5, 2017, Plaintiff and her brother, Steven Alsip, went to the Property Manager's office at Deerfield Springs, to inquire about recovering Plaintiff's property, as well as Plaintiff's mother's, property which had been left at the office. Upon their arrival, Karen Coffelt stated "Don't talk to me, Stephanie, please don't talk to me. I am not allowed to speak to you." Mr. Alsip then asked if Ms. Coffelt was permitted to speak to him, to which Ms. Coffelt affirmed that she could speak to him. Mr. Alsip then asked when they could pick up the personal effects Plaintiff and her family had left and was told they could be picked up Monday morning at 8:00 a.m.

30. On November 6, 2017, Karen Coffelt filed a false police report with the Verdigris Police Department and claimed that, on October 18, 2017, Plaintiff had informed Ms. Coffelt that when Plaintiff find's out who told on her mother, Kelle Alsip, that she was going to "cut a bitch." In the report, Ms. Coffelt also claimed that, on November 5, 2017, Plaintiff had told the new Assistant Property Manager's, Ana Solis, daughter, Chrystal, that Plaintiff was going to assault Ms. Coffelt.

31. On November 9, 2017, Plaintiff and her husband, Shane Davis, received separate eviction notices from Defendant's attorney, John T. Richer, terminating their lease effective December 31, 2017. The letter addressed to Plaintiff's husband was dated August 8, 2017, which indicates that Defendant had planned the eviction for some time.

32. On November 10, 2017, Plaintiff and her husband were personally served eviction notices by a process server at their residence.

33. On November 12, 2017, at around 9:30 p.m. or 10:00 p.m., Plaintiff observed Leo LNU, Maintenance Supervisor, walking around her storage unit and around the back of her mobile home. When Leo saw Plaintiff he darted behind her home. This behavior scared Plaintiff and she immediately returned inside of her home and locked the doors. After Plaintiff could not reach her husband on the phone, Plaintiff contacted a neighbor, Cassandra Ortiz, and asked her to sit with her until her husband returned home.

34. On November 14, 2017, Plaintiff's step-daughter, Schyler Davis, came to visit Plaintiff at her residence. Shortly after Schyler Davis arrived, she observed Leo LNU repeatedly driving circles around Plaintiff's residence for no reason.

35. Plaintiff's daughter, Justice Merriman, had previously applied for a lot with Defendant as her grandmother, Kelle Alsip, had transferred the titles to her mobile homes to Ms. Merriman. On November 17, 2017, a note was left on Plaintiff's door that Westwind Enterprises needed to speak to Plaintiff's daughter. When Ms. Merriman spoke to Karen Coffelt, Ms. Coffelt advised Ms. Merriman that her application was denied because she did not exceed 550 on her credit score. It is not, however, policy at Westwind Enterprises to check an applicant's credit score to rent a lot. When Plaintiff's daughter pressed Ms. Coffelt as to the real reason her application was denied, Ms. Coffelt simply stated "Stephanie knows why your application was denied."

36. On November 17, 2017, during a conversation with Ms. Coffelt about the denial of Plaintiff's daughter's application Plaintiff inquired with Ms. Coffelt as to whether she would be permitted to move her mobile home from Deerfield Springs as she had been evicted from the lot. Plaintiff asked this question because the financing on the mobile home was through Westwind Enterprises. Ms. Coffelt called Mary Smith, District Manager, to obtain the answer to this question and Plaintiff was informed that she would have to vacate the mobile home. When

Plaintiff pointed out that her loan was not in default, Plaintiff was informed that Ms. Smith would look into this further. Later that day, Plaintiff was verbally informed by Karen Coffelt that she would be permitted to move her mobile home.

37. On November 18, 2017, Plaintiff was present at the office regarding issues related to moving from Deerfield Springs. During a conversation with Karen Coffelt, Ms. Coffelt asked Plaintiff if she was recording their conversation, to which Plaintiff advised her that she was not recording. Ms. Coffelt then instructed Plaintiff to fill out lot deposit papers for Site 8 in her brother, Shawn Alsip's name, as the buyer, Karen Greene, would be denied a lot lease, just as Justice Merriman's lease was denied, if corporate was aware that it was Plaintiff's mobile home Ms. Greene had purchased. Plaintiff then asked Ms. Coffelt if Defendant was retaliating against her, which she answered in the affirmative and stated that she was waiting to get fired and wanted all of this to be over. Plaintiff then asked Ms. Coffelt why she had claimed to Defendant that Plaintiff had threatened her life. Ms. Coffelt then stated that she did not say that and that the first she had heard about that had been yesterday.

38. As Plaintiff was in the process of moving her mobile home, the moving company, Jack's Mobile Home Service, received a telephone call from Karen Coffelt and was informed that he was required to leave a $500.00 check at the office as a deposit before he would be allowed to move Plaintiff's mobile home from the lot. During Plaintiff's entire period of employment, as well as Plaintiff's mother, Kelle Alsip's employment, no moving company has ever been required to pay a deposit prior to moving a mobile home from Deerfield Springs.

39. Plaintiff's mobile home was removed from Deerfield Springs on December 30, 2017. To date, Plaintiff has not received a refund for her lot deposit even though she cleaned the lot and ran a box blade over the trailer pad when she moved from the lot.

40. Since Plaintiff moved from Deerfield Springs, Cavin and Karen Coffelt have begun driving around her mobile home in the new community in which she lives. This activity started the very day that Plaintiff moved and has continued since then. There is no reason for the Coffelts to be in Plaintiff's new community or for their continued harassment of Plaintiff and her family.

41. Plaintiff vehemently denies making the alleged disparaging comments to anyone, much less to any residents residing at Deerfield Springs, as Defendant alleges.

42. By, but not limited to, the actions described herein, Defendants have refused to fulfill its obligation to tender the full amount of the settlement proceeds to Plaintiff and, accordingly, have breached the terms of the settlement contract entered by the parties.

## FIRST CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

43. Plaintiff incorporates and re-alleges the above paragraphs as though fully set forth herein and further states, as follows:

44. A contract was formed between Plaintiff and Defendants on October 17, 2017;

45. Defendants breached the contract by refusing to tender payment in full as required by the plain terms of the contract;

46. Plaintiff has suffered damages, measured, at a minimum, by the loss of 50% of the agreed upon settlement, as a direct result of Defendants' breach of the contract.

## SECOND CLAIM FOR RELIEF
### (BAD FAITH)

47. Plaintiff incorporates and re-alleges the above paragraphs as though fully set forth herein and further states, as follows:

48. That Plaintiff and Defendants entered into a settlement contract which contained definite terms Defendants were required to comply, including payment of a sum certain to Plaintiff;

49. That Defendants breached this agreement by virtue of its refusal to pay the settlement proceeds it had previously contracted to pay;

50. That Defendants' actions were unreasonable;

51. That Defendants did not deal fairly and in good faith and, in fact, behaved intentionally, maliciously and in wanton and reckless disregard of Plaintiff's rights under the contract when it improperly defined the non-disparagement clause to preclude the comments Defendants attributed to Plaintiff; and

52. That Defendants' failure to deal in good faith with Plaintiff resulted in harm and damage to Plaintiff.

## THIRD CLAIM
### (RETALIATION IN VIOLATION OF THE ADAAA)

53. Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein and would state, as follows:

54. Plaintiff engaged in protected activity by reporting the discrimination she was subjected to regarding her disability to Defendant;

55. Plaintiff had a reasonable and good faith belief that she was subjected to discrimination on the basis of her disability and acted in a reasonable manner in opposing said discrimination;

56. After participating in the mediation in good faith, Plaintiff believed she had successfully resolved all claims she had against Defendant, including the ADA claim;

57. Despite the settlement Plaintiff entered with the Defendant, Plaintiff was subjected to materially adverse actions by Defendant, including but not limited to: increasing Plaintiff's water bill; dismissing Plaintiff's mother from her employment with Defendant; evicting Plaintiff from her mobile home on Defendant's lot; Subjecting Plaintiff's family members to disparate application standards while evaluating their home financing applications to

Defendant's lot; unduly demanding payment from movers helping Plaintiff move her mobile home; unduly withholding Plaintiff's security deposit despite the fact that Plaintiff completely cleaned out her lot; fabricating and soliciting individuals to falsely testify against Plaintiff; unduly harassing and violating Plaintiff's privacy through its agents; falsely accusing Plaintiff of violating the non-disparagement clause of the agreement; acting in bad faith towards Plaintiff; and ultimately breaching the contract the parties entered into;

58. Defendant's conduct towards Plaintiff was retaliatory in violation of the ADA anti-retaliation provision, for asserting her ADA claims against the company during mediation;

59. Plaintiff has suffered various forms of damages as a result of Defendant's retaliatory acts.

**WHEREFORE**, premises considered, Plaintiff prays that the Defendants appear and answer this petition, and that this court: (1) enter a judgment for Plaintiff in an amount in excess of $10,000 plus interest, costs, and attorney's fees; (4) award Plaintiff expectation damages; (5) award Plaintiff compensatory damages; (6) award Plaintiff punitive damages; (7) award Plaintiff her costs for bringing this action; (8) award Plaintiff a reasonable attorneys fee for bringing this action; and (9) grant Plaintiff such other and further relief as this Court may deem just, proper and equitable.

Respectfully submitted,

**ARMSTRONG & VAUGHT, P.L.C.**

By:   *s/ Charles C. Vaught*
**Charles C. Vaught, OBA #19962**
2727 East 21st Street, Suite 505
Tulsa, OK 74114
(918) 582-2500 – *telephone*
(918) 583-1755 – *facsimile*
***Attorney for Plaintiff***